UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Joseph Crocco

    v.                                              Civil No. 19-cv-882-LM
                                                       Opinion No. 2023 DNH 023 P

Richard Van Winkler, et al.

## **O R D E R**

Plaintiff Joseph Crocco, an inmate formerly housed at the Cheshire County Department of Corrections ("Cheshire County Jail"), brings suit against defendants Barnes Peterson, Sergeant Michael Ouellette, Captain Michael Thompson, Major James Erwin, Sergeant McKim Mitchell, and Sergeant Jeremy France.[1]  Crocco alleges that the defendants violated his Eighth Amendment rights because they acted with deliberate indifference to his plan to die by suicide.

The defendants moved for summary judgment on the ground that Crocco failed to exhaust his administrative remedies under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a).  The court denied the motion, finding that a reasonable jury could conclude that the administrative grievance procedure was not available to Crocco.  Crocco v. Van Wickler, 596 F. Supp. 3d 325, 330 (D.N.H. 2022).  The defendants moved for reconsideration, and, in the alternative, requested that the court hold a hearing to resolve the factual disputes and issue a ruling on the merits of their PLRA exhaustion affirmative defense.

---

[1] Defendants have previously indicated that Sgt. France is deceased (doc. no. 10 at 1 n.1), though no suggestion of death has been filed.  See Fed. R. Civ. P. 25(a).

The court denied the motion for reconsideration but granted an evidentiary hearing, which it held on January 17, 2023.  Doc. no. 48; see also Burns v. Croteau, 561 F. Supp. 3d 164, 168 (D.N.H. 2020) (noting that the First Circuit has not opined on the issue, but seven other circuits have determined that exhaustion issues, including factual disputes, should be decided by the court).  After weighing the evidence presented at the hearing, the court finds that defendants have not carried their burden to show that Crocco failed to exhaust the jail's available administrative remedies.  This order constitutes the court's findings of fact and conclusions of law.  See Fed. R. Civ. P. 52(a).

## BACKGROUND

At the January 17 hearing, the court heard testimony from Joseph Crocco and three former Cheshire County Jail employees: Barnes Peterson, Sgt. Michael Ouellette, and Captain Michael Thompson.  The court makes the following findings of fact based on the evidence presented during the evidentiary hearing.

I.  <u>Crocco's attempted suicide</u>

In early 2018, Crocco was indicted on a federal bank robbery charge.  Starting in July 2018, Crocco was held at the Cheshire County Jail pending his federal trial.  On September 25, 2018, a jury found Crocco guilty of bank robbery.  Believing he faced, in effect, a life sentence, Crocco made plans to take his own life.  When he returned to the Cheshire County Jail after the jury's verdict, Crocco began

to give away his possessions to other inmates, and he called his family to say goodbye. Another inmate told jail staff about Crocco's intent to commit suicide.

The next morning, September 26, Captain Thompson informed Sgt. Mitchell, who was one of Crocco's cell block managers, about a "rumor" that Crocco intended to attempt suicide. Exh. 2. Sgt. Mitchell told another on-duty manager, Sgt. France, about Crocco's intent to commit suicide. About two hours later, Crocco asked Sgt. Mitchell and Sgt. France for a razor. They gave Crocco the razor, and Crocco went back to his cell. Crocco cut his neck using the razor's blade. He then laid in his bed until he lost consciousness. About 10 minutes later, Sgt. France checked Crocco's cell and saw that Crocco had used the razor to attempt suicide. Jail staff immediately called for medical attention.

Crocco woke up in a hospital where he was treated for his injuries. Crocco was returned to the jail that afternoon. He was placed on suicide watch, which consists of placement in a cell where the inmate can be observed in a different block of cells separated from the general population. Crocco was not permitted access to his personal property or anything that he could use to harm himself, including pens or pencils. At the jail, inmates on suicide watch have minimal contact with other people. Crocco remained isolated in his cell all day, except for short periods when officers escorted him to a shower.

While on suicide watch, Crocco continued to devise ways to commit suicide, including by refusing to eat or take medication. Crocco attempted to drown himself in the cell's sink, and he wrote that he wanted to die in blood on the cell's wall.

3

Crocco asked for a pen to write to his family, but he testified that if jail staff had provided him with a pen, he would have used it to attempt suicide.

On September 28, Crocco learned from counsel that his sentence was likely to be much shorter than previously expected. Thereafter, Crocco abandoned his thoughts of suicide. He began eating again and taking his medications.

On October 1—approximately five days after Crocco's initial suicide attempt—the jail's mental health clinician, Barnes Peterson, determined that Crocco was no longer a threat to himself. Peterson approved Crocco's release from suicide watch.

The jail did not move Crocco back to general population at that time. To punish him for attempting suicide, the jail put Crocco in a disciplinary cell. Crocco's time in the disciplinary cell was like his time on suicide watch, except that Crocco could spend about an hour in the dayroom, where he could access the dayroom kiosk that prisoners can use to submit grievances.[2] Crocco also had access to pens and limited access to his belongings.

Crocco was eventually returned to general population and then transferred to a federal prison in November 2018. Crocco filed this suit in August 2019 while incarcerated in a federal prison.

---

[2] During the evidentiary hearing, several witnesses discussed the jail's dayroom and the kiosk. However, no witness offered specific details about what the jail's "dayroom" is or what the "kiosk" is. From context, the court infers that the "dayroom" is a common area where inmates can congregate. The court likewise infers from the witness testimony that the "kiosk" is a computer. Inmates can use the kiosk to access several different services.

II.     Cheshire County Jail's Grievance Procedure

The jail's inmate manual sets out a grievance procedure that inmates can use to inform jail staff about issues in the jail. Specifically, page 26 of the inmate manual states that inmates must file a grievance on the kiosk or in writing any time they feel they have been "unfairly treated or denied rights that [they] are entitled to under the rules and regulations of this facility. . . to allow for correcting of the problem." Exh. 15.

The procedure requires inmates to submit grievances on the kiosk in the dayroom or in writing "within Seven (7) Calendar days of the event" about which they have a complaint. Id. There is no exception to the seven-day limitations period.

Since the event about which Crocco complains (i.e., handing him a razor despite being aware of his suicidal intent) occurred on September 26, 2018, the deadline for Crocco to file a grievance under the jail's policy was October 3.

III.     The jail's efforts to communicate the existence of the grievance procedure to Crocco

The evidence established that Crocco never submitted a grievance about this incident. Indeed, Crocco never submitted a grievance about anything during the time he was incarcerated at the Cheshire County Jail. Crocco testified that, in his experience at other prisons, grievance procedures usually had one-year limitations periods.

The evidence about the jail's efforts to communicate the existence of the grievance procedures to Crocco consisted of generalized testimony about both the jail's efforts to make the inmate manual available to prisoners and the orientation and intake process at the jail.  The jail does not provide inmates their own copies of the inmate manual.  Instead, the jail places at least three English-language copies and one Spanish-language copy of the inmate manual in each dayroom.  The grievance policy can also be found on the kiosk in each dayroom, and a jail staff member is always available in the dayroom to answer any inmate questions, including about the grievance policy.

Captain Thompson testified that, on a "regular basis" as part of intake procedures when prisoners arrive at the jail, jail staff encourage inmates to read the inmate manual to familiarize themselves with the jail's policies.  The jail also regularly encourages inmates to do the same when the jail transfers them to a new unit within the facility.  The jail's philosophy, however, is to encourage staff-inmate interaction.  So, rather than feeding information to inmates, the jail encourages inmates to ask questions to jail staff.  Thus, Captain Thompson emphasized that any inmate, including Crocco, could ask a jail staff member about the jail's grievance procedure.

Captain Thompson was not personally involved in Crocco's intake process, and he had no personal knowledge about what information the jail provided to Crocco.  Crocco could not recall ever reviewing the inmate manual with any jail staff member.

6

The jail used a written inmate orientation checklist to document the date on which jail staff informed each inmate about, among other items, the location of the inmate manual and grievance forms.[3] The jail began using the checklists because it believed the checklists could be used to show that an inmate was at least made aware of the inmate manual.[4] No jail staff member who testified at the hearing could recall exactly when the practice of using inmate orientation checklists started. Sgt. Ouellette, who retired in 2021,[5] testified that the jail began using the checklists in the last few years of his career. Captain Thompson characterized the orientation checklists as "short-lived," but he could not testify to when the use of checklists started or stopped.

There was only one such checklist for Crocco admitted into evidence. This checklist was dated October 7—four days after the expiration of the seven-day limitation period in this case. No witness testified to being aware of any other inmate orientation checklist existing for Crocco. Crocco acknowledged that the signature on the checklist was his, and he testified that he was not informed about

---

[3] The orientation checklist references "grievance forms," but the jail's grievance procedure does not require inmates to use a grievance form and defendants did not submit any evidence about what the jail's grievance forms looked like or where inmates could find them.

[4] Captain Thompson originally testified that the jail believed a signed checklist would show the inmate had read the manual. He later clarified his testimony in this respect.

[5] Sgt. Ouellette testified that he began working at the jail in 2001 and that he retired after 20 years of service. The court thus infers that he retired in 2021.

the information in the checklist—that is, the location of the inmate manual and grievance forms—before October 7.

## DISCUSSION

Defendants argue that, under the PLRA, the court must dismiss Crocco's suit because he failed to file a grievance per the Cheshire County Jail's written grievance procedure within seven days of his attempted suicide. In response, Crocco acknowledges that he did not use the jail's grievance procedure. Crocco argues, however, that he could not use the procedure while he was on suicide watch and that he was, in any event, unaware of the grievance procedure during the seven-day period in which he could have filed a grievance.

"No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Thus, under the PLRA, a plaintiff-inmate must exhaust a jail's "available" administrative remedies before bringing any federal action relating to prison conditions. Id.; Porter v. Nussle, 534 U.S. 516, 524 (2002). Federal courts have no discretion to hear a prison conditions lawsuit unless the plaintiff-inmate has satisfied that exhaustion requirement. Porter, 534 U.S. at 524. Claims that are not properly exhausted are subject to dismissal. See Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).

The requirements for exhaustion are determined by a jail or prison's own administrative procedures, not the PLRA itself. Jones v. Bock, 549 U.S. 199, 218

8

(2007). Thus, the grievance procedure stated in the jail's inmate manual—to the extent it was "available"—constitutes the administrative procedure that Crocco needed to exhaust prior to bringing this action about the jail's conditions.

Per the PLRA's text, prisoners need only exhaust "available" administrative procedures. Burns, 561 F. Supp. 3d at 168. In the context of the PLRA, "available" means "'capable of use' to obtain 'some relief for the action complained of.'" Ross v. Blake, 578 U.S. 632, 642 (2016). The Supreme Court explained in Ross, however, that this definition "is just to begin," because applying this abstract definition to "the real-world workings of prison grievance systems" requires courts to engage in a practical, context-sensitive, and fact-specific analysis. See id. at 643. To that end, "[b]uilding on [its] own and lower courts' decisions," the Supreme Court discussed three potential real-world scenarios that were "relevant" to the case before it. See id.

First, an administrative procedure can be functionally unavailable if "it operates as a simple dead end," meaning that prison officials are "unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Second, an administrative procedure could be "too confusing, baroque, or flawed to be navigated to completion by a reasonable prisoner." Burns, 561 F. Supp. 3d at 168 (citing Ross, 578 U.S. at 643-44). In other words, a remedy that a "rational inmate cannot be expected to use" is not capable of use. Ross, 578 U.S. at 644 (quoting Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008)). Third, prison officials

9

might thwart prisoners' efforts to use a grievance procedure "through machination, misrepresentation, or intimidation." Id.

While the Supreme Court's three illustrations highlight some circumstances in which an administrative procedure can be unavailable, they are neither exhaustive nor exclusive. Ramirez v. Young, 906 F.3d 530, 538 (7th Cir. 2018). An administrative procedure may be unavailable even if the circumstances do not precisely fit into one of the three illustrations discussed in Ross. Id.; see also Andres v. Marshall, 867 F.3d 1076, 1078 (9th Cir. 2017) (describing the Ross illustrations as "non-exhaustive"); Williams v. Corr. Officer Priatno, 829 F.3d 118, 124 n.2 (2d Cir. 2016) ("We note that the three circumstances discussed in Ross do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were 'relevant' to the facts of that case."). And this is one such case in which the circumstances that make the jail's grievance procedure unavailable, while similar in kind, do not neatly fit any one of the three Ross examples.

Here, Crocco claims that the jail's grievance procedure was unavailable to him because he did not know about it. On its own, however, an inmate's ignorance of a grievance procedure does not mean it is unavailable. E.g., Ramirez, 906 F.3d at 538. A grievance procedure will be considered unavailable if the inmate was, in fact, ignorant of the procedure and the jail failed to take "reasonable steps" to inform him about the procedure. See id.; see also Hernandez v. Dart, 814 F.3d 836, 842 (7th Cir. 2016) (stating that unavailability "extends beyond 'affirmative misconduct' to omissions by prison personnel, particularly failing to inform the

10

prisoner of the grievance process"); Valerio v. Wrenn, No. 15-cv-248-LM, 2019 WL 1333273, at *4 (D.N.H. Mar. 25, 2019) ("Remedies that are not reasonably communicated to inmates may be considered unavailable for exhaustion purposes.") (quoting Small v. Camden Cnty., 728 F.3d 265, 271 (3d Cir. 2013)).

The First Circuit has not opined about the scope of the "availability" exception in circumstances like the one presented here. However, the court is persuaded that the First Circuit would adopt the Seventh Circuit's well-reasoned approach from Ramirez v. Young, which is consistent with the Supreme Court's decision in Ross as well as with the nature of PLRA exhaustion—an affirmative defense for which the defense must show both availability and non-exhaustion.

The evidentiary hurdle is not high. A jail clears it by putting on credible evidence that it informed the prisoner how to access information about the grievance procedure and ensured that the information was in fact accessible. See Latin v. Johnson, No. 18 CV 02717, 2019 WL 5208856, at *5 (N.D. Ill. Oct. 16, 2019) ("[P]roviding an inmate with an informational handbook outlining the grievance procedure has been deemed to be adequate notice.") (citing Boyd v. Corr. Corp. of Am., 380 F.3d 989, 999 (6th Cir. 2004)). But simply pointing an inmate to a manual without explaining that it contains information about the jail's grievance procedure is not sufficient. See id. at *6 (finding that jail did not take reasonable steps to communicate its five-day grievance limitations period to inmate when information was only accessible at computer kiosk or during an orientation video played "at random times twice per week"). Rather, the jail must put on credible evidence that

it took reasonable steps to communicate the grievance procedure's existence and, at least, how to access more information about it. See Ramirez, 906 F.3d at 538 ("Prisons must affirmatively provide the information needed to file a grievance.").

Here, defendants have failed to carry their burden to show by a preponderance of the evidence that the jail took reasonable steps to communicate the grievance policy to Crocco.[6] At the hearing, defendants submitted evidence that the jail's inmate manual describes the grievance procedure and that the inmate manual could be found in the jail's dayroom along with a kiosk that can be used for, among other things, submitting grievances.

The strongest evidence put forward by defendants about the steps they took to communicate the grievance policy to Crocco is testimony by Captain Thompson that jail staff "on a regular basis" tell new inmates about the inmate manual when they first arrive at the jail and when they transfer between units. There are two problems with this testimony. First, evidence that the jail told new inmates "on a regular basis" about a manual is not the same as testimony that the jail had—in July 2018—a policy and practice to inform each new inmate about the manual.

---

[6] At summary judgment, the court found that there was a genuine dispute of material fact specifically as to whether Crocco could have used the jail's grievance procedure before the seven-day limitations period expired. In other words, there was a question about whether, given Crocco's isolation under suicide watch, he could have filed a grievance before the seven-day window expired. Considering the evidence presented at the evidentiary hearing, defendants have shown that, had he known about it, Crocco could have accessed the grievance procedure before the seven-day limitations period expired, and, specifically, in the two days after he was released from suicide watch. During those two days, Crocco had access to the kiosk in the jail dayroom, and he could have filed a grievance using the kiosk.

Second, it is not clear that simply pointing to the existence of an inmate manual, without specifying that the jail's grievance policy is explained within, is sufficient to meet the jail's burden to communicate the existence of the grievance policy. See Ramirez, 906 F.3d at 535 ("Before dismissing a prisoner's complaint for failure to exhaust, the district court should be able to point to evidence that the relevant administrative procedures were explained in terms intelligible to lay persons.") Crocco, by contrast, testified based on his personal knowledge that he was not told about the inmate manual or grievance procedure before October 7.[7] See DeBenedetto v. Salas, No. 13-CV-07604, 2022 WL 1292217, at *7 (N.D. Ill. Apr. 29, 2022) (finding jail did not meet its burden where it relied solely on the existence of the inmate manual and the likelihood that plaintiff inmate would have received a copy upon entrance).

To be sure, testimony from an officer who personally told Crocco about the grievance policy is not necessary to meet defendants' burden. As explained, it would likely have been enough if a witness had credibly testified, with sufficient personal knowledge, that it was the jail's policy and practice in July 2018 to inform all new inmates both about the inmate manual and that it contained information

---

[7] Crocco's testimony was corroborated by the October 7 checklist, which appeared to support his claim that no one told him about the existence of the grievance policy before that date. Moreover, the court credited Crocco's testimony about his knowledge of the grievance policy because he did not try to exaggerate and embellish the facts in his favor; that is, he did not suggest when he testified that he would have filed a timely grievance but for his undisputed suicide attempt and compromised mental state.

13

about the grievance procedure. No witness testified to such a policy or practice here.

Moreover, the existence of the October 7 orientation checklist undermines defendants' claim that the jail might have communicated the inmate manual and the grievance policy's existence to Crocco when he first entered the jail in July 2018. Cf. id. (holding jail's burden not met where evidence showed it was jail's practice to record each inmate's receipt of manual containing the grievance procedure but no such record was produced for the inmate in question); see also Latin, 2019 WL 5208856, at *5 (finding jail did not meet its burden where a jail official testified that all inmates sign a form acknowledging that they know where to find grievance procedures but jail failed to introduce plaintiff's form into evidence). The evidence here showed that, while Crocco was housed in the jail, the jail used and saved orientation checklists describing when staff told inmates where to find the inmate manual and grievance forms.[8] But no orientation checklist was produced for Crocco's initial arrival at the jail in July 2018, which implies that October 7 was the earliest Crocco was informed about the inmate manual and the existence of a grievance procedure.

Even assuming this checklist was sufficient to show the jail took reasonable steps to inform Crocco about the grievance procedure, it came too late for Crocco to

---

[8] The checklist does not indicate that inmates were told about the specific requirements or limitations of the grievance procedure itself (which does not require use of a grievance form).

use the grievance procedure, as the seven-day period in which he could have filed a grievance about the suicide attempt had expired by October 7. See Rucker v. Giffen, 997 F.3d 88, 94 (2d Cir. 2021) (holding that where a grievance procedure's limitations period has already expired and no exception to the limitations period exists, the jail cannot point to an inmate's failure to use that previously-unavailable grievance procedure as evidence to help satisfy its affirmative defense).

Captain Thompson attempted to explain away the absence of other orientation checklists for Crocco, testifying that the jail only used the orientation checklists for a short period of time. But Captain Thompson could not say when the practice started or stopped.[9] Given Captain Thompson's minimal recollection about the length of time the jail used the orientation checklist, the court finds the argument that the jail may not have been using the orientation checklists in July 2018 unpersuasive.

The jail argues that, regardless of whether jail staff affirmatively told Crocco about the inmate manual or grievance procedure, Crocco would have been informed of the grievance policy if he had asked an officer about whether the jail had a grievance policy. But jails cannot place the burden on prisoners to uncover a jail's grievance procedures by interrogating guards. See Ramirez, 906 F.3d at 538 (rejecting same argument and reasoning, "What would have tipped [the inmate] off to ask that particular question, as opposed to a hundred others?"); Hernandez, 814

---

[9] Captain Thompson's testimony that the practice was short lived was also inconsistent with Sgt. Ouellette's indication that the practice continued at least until his 2021 retirement.

F.3d at 842 ("It is not incumbent on the prisoner to divine the availability of grievance procedures."). Defendants also contend that Crocco should have known the jail had a grievance procedure because of his experience in other prisons. Crocco's potential knowledge about other prisons' grievance policies does not obviate the jail's responsibility to take reasonable steps to make him aware of its policy. See Ramirez, 906 F.3d at 538 (rejecting same argument).

Finally, in Croteau v. Burns, this court found that a jail's grievance procedure was available to a plaintiff even though he claimed he had not received a copy of the inmate handbook upon arrival at the jail in accordance with its standard procedures. 561 F. Supp. 3d at 172. However, in Croteau, the plaintiff had previously used that jail's grievance procedure, demonstrating his actual knowledge of the grievance procedure regardless of whether the jail had taken reasonable steps to inform him about it. Id. By contrast, here, Crocco never submitted a grievance while at the Cheshire County Jail. This fact distinguishes this case from Croteau as well as other cases in which courts have disregarded a plaintiff's claimed ignorance of a jail's grievance procedures. See id.; Polansky v. McCoole, No. 13-CV-458-JL, 2016 WL 237096, at *5 (D.N.H. Jan. 20, 2016) (finding that plaintiff's "consistent employment" of the first step of a three-step grievance procedure left "no question" that the second and third steps of the procedure were also available to him).

In sum, defendants failed to present sufficient evidence to persuade the court that, more likely than not, the jail took reasonable steps to communicate the

existence of the grievance procedure to Crocco or that Crocco had actual knowledge of the grievance procedure. For that reason, the jail has not met its minimal burden to show that the grievance procedure at the jail was available for Crocco to exhaust. And because an inmate need only exhaust available administrative procedures, defendants' PLRA exhaustion defense is denied. See Ramirez, 906 F.3d at 530; Goebert v. Lee Cnty., 510 F.3d 1312, 1323 (11th Cir. 2007) ("That which is unknown and unknowable is unavailable; it is not 'capable of use for the accomplishment of a purpose.'") (quoting Booth v. Churner, 532 U.S. 731, 738 (2001)).

## CONCLUSION

For the foregoing reasons, the court denies defendants' PLRA affirmative defense. The court also denies Crocco's motion (doc. no. 60) for leave to file an additional exhibit. The court has not considered the proposed exhibit (doc. no. 60-1) in deciding the merits of defendants' PLRA affirmative defense.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

March 3, 2023

cc: Counsel of Record